## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| BRADLEE WILSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br>v.<br><br>DAVID YURMAN ENTERPRISES, LLC and ORACLE CORPORATION,<br><br>*Defendants.* | Case No.: 1:25-cv-1865<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT
### AND JURY DEMAND

Plaintiff Bradlee Wilson ("Plaintiff"), individually and on behalf of all others similarly situated, sues David Yurman Enterprises, LLC ("David Yurman") and Oracle Corporation ("Oracle") (together, "Defendants"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendants. Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of his counsel, and the facts that are a matter of public record.

## I.     INTRODUCTION

1.     This class action arises out of the recent data security incident and data breach that was perpetrated against Defendants (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") of Plaintiff and other current and former employees of David Yurman, the Class Members. This Data Breach occurred between August 9, 2025, and August 12, 2025.[1]

---

[1] https://mm.nh.gov/files/uploads/doj/remote-docs/david-yurman-20251112.pdf

2.    Defendant David Yurman is a luxury jewelry design and manufacturing company.[2]

3.    Defendant Oracle is a multinational technology and enterprise software firm.[3]

4.    David Yurman is an enterprise consumer of Oracle and uses Oracle's software for business and commercial purposes.[4]

5.    As such, Oracle stores a litany of highly sensitive personal identifiable information ("PII") about David Yurman's current and former employees . But such PII was inadequately protected and thus exposed to cybercriminals in a data breach (the " Data Breach ").

6.    The Private Information was acquired by the cyber-criminal gang Cl0p who perpetrated the attack and remains in the hands of those cyber-criminals.[5]

7.    Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information was subjected to unauthorized access by a ransomware group and precisely what type of information was accessed.

8.    This Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect the Private Information of Plaintiff and Class Members.

9.    Defendants maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendants' computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a

---

[2] https://www.davidyurman.com/world-of-yurman.html-3
[3] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Nov. 18, 2025).
[4] https://www.comparitech.com/news/sato-corp-says-data-breach-claimed-by-ransomware-gang-exposed-personal-info/
[5] https://cloud.google.com/blog/topics/threat-intelligence/oracle-ebusiness-suite-zero-day-exploitation

known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

10.     While many details of the Data Breach remain in the exclusive control of Defendants, upon information and belief, Defendants breached their respective duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the PII; (7) failing to recognize or detect that the network had been compromised and accessed its network in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

11.     Defendants, through their employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendants also failed to disclose that they did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

12.     In addition, Defendants' employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendants' employees

(presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

13.     As a result of Defendants' unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injurie and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their PII; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

14.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

16.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendants' data security systems, future annual audits, and adequate credit monitoring services funded by Defendants.

17.     Accordingly, Plaintiff sues Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II.     PARTIES

18.     Plaintiff Bradlee Wilson is a citizen of Nashville, Tennessee, and intends to remain there throughout this litigation.

19.     Defendant David Yurman is a Delaware Corporation with its principal place of business at 24 Vestry Street, New York, New York.

20.     Defendant Oracle Corporation is a corporation incorporated in Delaware and with its principal place of business at 2300 Oracle Way, Austin, Texas 78741. The registered agent for service of process is Corporation Service Company dba CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendants, including Plaintiff.

22.     This Court has personal jurisdiction over Defendants because Oracle Corporation's headquarters and principal place of business is located in the Austin Division of the Western District of Texas and both Defendants regularly conduct business in Texas and have sufficient minimum contacts in Texas.

23.     Venue is proper in the Austin Division of the Western District of Texas  because Defendant Oracle's  principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's  claims occurred in this District.

5

### III.    FACTUAL ALLEGATIONS

**A. DEFENDANTS' BUSINESSES**

24.    David Yurman Enterprises LLC is a luxury jewelry design and manufacturing company known for its American-crafted artisan styles and elegant use of precious metals and stones. Founded by David and Sybil Yurman in 1980, the company is headquartered in New York City and sells fine jewelry worldwide through retail stores and online channels.[6]

25.    Defendant Oracle is a multinational technology and enterprise software firm.[7]

26.    David Yurman is an enterprise consumer of Oracle and uses Oracle's software for business and commercial purposes.[8]

27.    As part of their business, Defendants receive and maintain the PII of thousands of David Yurman's current and former employees.

28.    Plaintiff and Class Members include both current and former employees of David Yurman.

29.    In the ordinary course of employment with David Yurman, Plaintiff and Class Members were required to provide (and Plaintiff did provide) David Yurman with their sensitive, personal, and private information.

30.    Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

31.    By collecting and retaining the Private Information of Plaintiff and Class Members for its own financial benefit, Defendants assumed an ongoing duty to implement and maintain

---

[6] https://www.davidyurman.com/world-of-yurman.html-3
[7] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Nov. 10, 2025).
[8] https://www.comparitech.com/news/sato-corp-says-data-breach-claimed-by-ransomware-gang-exposed-personal-info/

reasonable safeguards to protect such information for unauthorized disclosure to third parties. This duty extended not only to safeguarding the information while in Defendants' possession, but also to the proper and secure disposal or destruction of the Private Information of potential employees.

**B.   THE DATA BREACH**

32.     A Data Breach occurs when unauthorized cyber criminals access a computer network system that has not been adequately and reasonably secured.

33.     Defendant David Yurman Corporation was impacted in a widespread cyberattack targeting organizations that use Oracle E-Business Suite ("Oracle EBS"). Public reporting attributes the campaign to a profit-driven threat actor known as FIN11, with the Cl0p ransomware group acting as the public-facing arm of the operation. In late September 2025, Cl0p began listing alleged victims of the Oracle EBS intrusion on its leak site, ultimately naming twenty-nine organizations across multiple sectors, including universities, industrial firms, automotive suppliers, transportation companies, and retailers such as David Yurman.[9]

34.     Cybersecurity analysts have reported that attackers exploited previously unknown vulnerabilities (including CVE-2025-61882 and CVE-2025-61884) that allowed remote, unauthenticated access to sensitive data stored within Oracle EBS environments. Cl0p has already leaked data stolen from numerous victims, and initial structural analysis indicates that the files originated from Oracle systems. Given Cl0p's history and the consistency of the attack pattern, cybersecurity experts consider it unlikely that organizations were falsely listed as victims.[10]

---

[9] https://www.securityweek.com/nearly-30-alleged-victims-of-oracle-ebs-hack-named-on-cl0p-ransomware-site/
[10] *Id.*

35.     The New Hampshire Department of Justice, Bureau of Securities Regulation published a letter dated November 12, 2025 directed to Attorney General Formella and referencing David Yurman Enterprises LLC and its legal counsel, which states in part:[11]

**Nature of the Security Incident**

On September 29, 2025, David Yurman was contacted by a bad actor who claimed to have gained access to its Oracle E-Business Suite ("EBS") environment. In response, David Yurman launched a thorough investigation of its Oracle EBS environment with the assistance of experts to determine if the environment had been accessed without authorization. During the investigation, Oracle announced that it had identified a previously unknown and widespread flaw in its EBS software that permitted unauthorized actors to access many Oracle customers' EBS environments.

David Yurman's investigation confirmed that it was impacted by this exploit and determined that, between August 9, 2025, and August 12, 2025, certain data was accessed and acquired without authorization. Upon learning this, David Yurman conducted a prompt review of the impacted data in order to determine what information was affected and identify contact information for affected individuals. On October 28, 2025, David Yurman confirmed that certain individuals' personal information was affected by this incident. The affected information includes names and Social Security numbers of a limited number of current and former contractors for the company.

36.     Plaintiff and Class Members provided Defendants with their Private Information reasonably expecting and belief that Defendants had implied a promise and accepted the responsibility to keep such information confidential and secure from unauthorized access as part of their contract to do business together.

37.     Defendants' data security obligations were particularly important given the substantial increase in Data Breaches in the retail industry preceding the date of the breach.

38.     In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[12] Of the 2023 recorded

---

[11] https://mm.nh.gov/files/uploads/doj/remote-docs/david-yurman-20251112.pdf
[12] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited July 31, 2025).

data breaches, 119 of them, or over 3%, were in the transportation industry.[13] The 119 reported breaches reported in 2023 exposed over 10 million sensitive records. This is up from 2022 where there were a reported 65 breaches that exposed approximately eight hundred thousand sensitive records.[14]

39.    Data breaches such as the one experienced by Defendants have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

40.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

C.  *TEXAS BREACH NOTICE STATUTES*

41.    The State of Texas requires that any "person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Tex. Bus. & Com. Code Ann. § 521.053(b). In fact, "breach of a security system" is defined as "[the] unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information." Tex. Bus. & Com. Code Ann. § 521.053(a).

42. Defendants have yet to comply with Texas notice statues.

D.  *DATA BREACHES ARE PREVENTABLE*

43.    Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members,

---

[13] *Id.*
[14] *Id.* at 11, Fig.3.

causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

44.    Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

45.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[15]

46.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless

---

15 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited September 18, 2025).

absolutely needed; and those with a need for administrator accounts should only use them when necessary.

• Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

• Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

• Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

• Consider disabling Remote Desktop protocol (RDP) if it is not being used.

• Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

• Execute operating system environments or specific programs in a virtualized environment.

• Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[16]

47.    To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**
-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
-    Prioritize and treat commodity malware infections as potential full compromise;

---

[16] *Id.* at 3-4.

**Include IT Pros in security discussions**
-        Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
-        Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
-        Monitor for adversarial activities
-        Hunt for brute force attempts
-        Monitor for cleanup of Event Logs
-        Analyze logon events;

**Harden infrastructure**
-        Use Windows Defender Firewall
-        Enable tamper protection
-        Enable cloud-delivered protection
-        Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[17]

48.     Given that Defendants were storing the Private Information of Defendants' current and former employees, Defendants could and should have implemented all the above measures to prevent and detect cyberattacks.

49.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

**E.  DEFENDANTS ACQUIRE, COLLECT & STORE EMPLOYEES' PRIVATE INFORMATION**

50.     Defendants acquire, collect, and store a massive amount of Private Information belonging to David Yurman's current and former employees, including Plaintiff and the Class.

---

[17]     *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed September 18, 2025).

David Yurman collects this information in its capacity as employer, and Oracle obtains and stores this same information through the Oracle software platform it provides to David Yurman.

51.    As a condition of employment with David Yurman, Plaintiff and Class Members were required to entrust David Yurman—and, through David Yurman's use of Oracle's systems, Oracle—with highly sensitive personal and, in some cases, protected information.

52.    By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information within David Yurman-controlled systems and the Oracle-managed platform, Defendants assumed legal and equitable duties, and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

53.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to David Yurman or Oracle absent a promise—express or implied—to safeguard that information.

54.    Upon information and belief, while collecting Private Information from employees, including Plaintiff, David Yurman represented, and Oracle represented through its platform and related disclosures, that employee information would be maintained confidentially and secured in accordance with applicable privacy laws, industry standards, and internal policies.

55.    Plaintiff and the Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for employment-related and business purposes only, and to make only authorized disclosures of this information.

**F.  VALUE OF PRIVATE INFORMATION**

56.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18]

---

[18] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

57.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

58.    For example, Personal Information can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22] Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

---

[19] *Id.*

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

59.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

60.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

61.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

62.    Defendants knew or should have known of the risks and strengthened its data systems accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## G.    DEFENDANTS FAIL TO COMPLY WITH FTC GUIDELINES

63.    The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

64.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal Private Information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks;

understand their network's vulnerabilities; and implement policies to correct any security problems.[23]

65.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

66.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

67.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect the Private Information in their possession by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[emphasis added].

68.     Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

69.     These FTC enforcement actions include actions against entities like Defendants. *See, e.g., In the Matter of LabMD, Inc.*, A Corp, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data

---

[23] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf    (last    visited September 18, 2025).
[24] *Id.*

security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

70.    Defendants failed to properly implement basic data security practices.

71.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

72.    Defendants were always fully aware of their obligations to protect the PII of their employees and clients. Defendants were also aware of the significant repercussions that would result from its failure to do so.

### H. DEFENDANTS FAIL TO COMPLY WITH INDUSTRY STANDARDS

73.    As shown above, experts studying cyber security routinely identify manufacturing and wholesale businesses and their affiliates as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

74.    Several best practices have been identified that a minimum should be implemented by entities like Defendants, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

75.    Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

76.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77.     These foregoing frameworks are existing and applicable industry standards in the industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## I.   *PLAINTIFF AND THE CLASS MEMBERS HAVE AND WILL EXPERIENCE SUBSTANTIAL HARM*

78.     Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendants.

79.     The ramifications of Defendants' failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

80.     Because of Defendants' failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;

- The diminution in value of their PII;

- The compromise and continuing publication of their PII;

- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and

- The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the PII in its possession.

81.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.[25]

82.     The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

83.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

84.     One such example of criminals using PII for profit is the development of "Fullz" packages.

85.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of

---

[25] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

86.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

87.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.[26]

88.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendants did not rapidly report to Plaintiff and the Class that their PII had been stolen.

89.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[26] https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120

90.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

91.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

92.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[27]

93.    The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;

- retaining payment card information only as long as necessary;

- properly disposing of personal information that is no longer needed;

- limiting administrative access to business systems;

- using industry-tested and accepted methods for securing data;

---

[27] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited September 18, 2025).

- monitoring activity on networks to uncover unapproved activity;

- verifying that privacy and security features function properly;

- testing for common vulnerabilities; and

- updating and patching third-party software.

94.    According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[28]

95.    The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

96.    Defendants' failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

97.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## J.   DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT

98.    Data Breaches such as the one experienced by Defendants' clients and employees are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

99.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[29]

---

[28] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen    (last    visited September 18, 2025).
[29] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf

100.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[30]

101.    Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

102.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

103.    Theft of Private Information is gravely serious. PII is a valuable property right.[31] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

(last visited September 18, 2025) ("GAO Report").

[30] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited September 18, 2025).

[31] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

104.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

105.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

106.    There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

107.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[32]

108.    PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[32] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited September 18, 2025).

109.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[33]

110.    Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[34]

111.    Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

112.    It is also hard to change or cancel a stolen Social Security number.

113.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

114.    Defendants therefore knew or should have known this and strengthened its data systems accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[33] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 18, 2025).
[34] *Id* at 4.
[35] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 31, 2025).

## IV.    DEFENDANTS' BREACH

115.    Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and their data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of its networks and systems;

    c.    Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

    d.    Allowing unauthorized access to Class Members' Private Information;

    e.    Failing to detect timely that Class Members' Private Information had been compromised;

    f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

    g.    Failing to secure its stand-alone personal computers, such as reception desk computers, even after discovery of the data breach.

116.    As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

117.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## V.    PLAINTIFF'S EXPERIENCE

118.    Plaintiff Bradlee Wilson is and at all times mentioned herein was an individual citizen of Tennessee, residing in the city of Nashville.

119.    Plaintiff provided Defendant David Yurman with his sensitive PII as a condition of employment with David Yurman. After Plaintiff provided his Private Information, Defendants suffered a Data Breach.

120.    Plaintiff is careful about sharing his sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

121.    Plaintiff stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his sensitive online accounts.

122.    Had Plaintiff been aware that Defendants' computer systems were not secure, he would not have entrusted his personal data to Defendants.

123.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent self-monitoring his accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

124.    Even with the best response, the harm caused to Plaintiff cannot be undone.

125.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of his privacy.

126.    Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

127.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

## VI.    PLAINTIFF AND CLASS MEMBERS DAMAGES

128.    To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

129.    Defendants' failure to compensate is wholly inadequate as it fails to make whole all victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it provides no compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

130.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

131.    Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

132.    Plaintiff and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

133.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

134.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

135.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

136.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

137.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

138.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

139.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

140.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

     a.  Finding fraudulent charges;

     b.  Canceling and reissuing credit and debit cards;

     c.  Purchasing credit monitoring and identity theft prevention;

     d.  Addressing their inability to withdraw funds linked to compromised accounts;

e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.  Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.  Contacting financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.  Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

141.  Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

142.  Further, because of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

143.  As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VII.    **CLASS ALLEGATIONS**

144.    This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

145.    Plaintiff brings this action on behalf of themselves and on behalf of all other persons similarly situated.

146.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons whose Private Information was actually or potentially accessed or acquired in the Data Breach that impacted David Yurman in August 2025 (the "Class").**

147.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

148.    Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

149.    This action satisfies the numerosity, commonality, typicality, and adequacy of requirements under Rule 23.

150.    <u>Numerosity</u>.  The Members of the Class are so numerous that joinder of all of them is impracticable. Upon information and belief, the proposed Class includes thousands of members.

151.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common

questions of law and fact include, without limitation:

a.  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b.  Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.  Whether Defendants had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e.  When Defendants learned of the Data Breach;

f.  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.  Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k.  Whether Defendants violated the consumer protection statutes invoked herein;

l.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages because of Defendants' wrongful conduct;

m.  Whether Plaintiff and Class Members are entitled to restitution because of Defendants' wrongful conduct; and

n.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced because of the Data Breach.

152.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because

Plaintiff's Private Information, like that of every other Class member, was compromised in the

Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

153.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

154.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

155.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

156. Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

157. Likewise, issues that will arise in this case are appropriate for class certification because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

    a. Whether Defendants failed to timely notify the public of the Data Breach;

    b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c. Whether Defendants' security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

    d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

    e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

158. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VIII.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members)

159. Plaintiff and the Class repeat and re-allege every allegation as if fully set forth herein.

160.    Plaintiff and the Class Members entrusted David Yurman, as their employer, and Oracle, as the provider and maintainer of the software platform housing their Private Information, with their Private Information.

161.    By collecting and storing this data in David Yurman's systems and in the Oracle-managed software environment, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard the systems under their respective control—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

162.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that the system and networks they controlled or utilized, and the personnel responsible for them, adequately protected the Private Information.

163.    Defendants' duty of care to use reasonable security measures arose because of the special relationship that existed between David Yurman as employer, Oracle as the vendor hosting employee data, and Plaintiff and the Class, which is recognized by laws and regulations including but not limited to the Federal Trade Commission Act, Tex. Bus. & Com. Code Ann. § 521.052, as well as common law. That special relationship arose because Plaintiff and the Class entrusted David Yurman and, through David Yurman's use of Oracle's platform, Oracle with their confidential Private Information, a necessary part of obtaining employment.

164.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

165.    Defendants further had a duty to use reasonable care in protecting confidential data because Defendants are bound by industry standards to protect confidential Private Information.

166.    Defendant also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(a) "to implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by [Defendant] in the regular course of business."

167.    Defendant also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(b) to destroy any Private Information that was no longer necessary for it to maintain.

168.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of the systems they controlled or utilized;

c.    Failing to periodically ensure that their systems had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to detect timely that Class Members' Private Information had been compromised;

f.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.    Failing to secure workstations and system endpoints used to access the Oracle platform, even after discovery of the data breach.

169.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

170.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

171.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

172.    Defendants' negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

173.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT II
### BREACH OF IMPLIED CONTRACT
#### (On behalf of Plaintiff and All Class Members)

174.    Plaintiff and the Class repeat and re-allege every allegation as if fully set forth herein.

175.    When Plaintiff and Class Members provided their Private Information to David Yurman as a condition of their employment, they entered implied contracts with David Yurman, and David Yurman in turn provided that information to Oracle to store and manage within Oracle's software environment,   under which both Defendants agreed to reasonably protect such information.

176.    Defendants solicited, offered, and invited Class Members to provide their Private Information as part of David Yurman's regular business practices and Oracle's provision of the platform David Yurman used to manage employee data. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

177.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, including the Federal Trade Commission Act, Texas statutes, and adhered to industry standards.

178.    Plaintiff and Class Members provided labor to David Yurman with the reasonable belief and expectation that David Yurman and Oracle would use part of their earnings to obtain adequate data security. Defendants failed to do so.

179.    Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

180.    Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

181.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

182.    Defendants breached their implied contracts with Class Members by failing to safeguard and protect their Private Information.

183.    As a direct and proximate result of Defendants' breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

184. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

185. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and All Class Members)

186. Plaintiff and the Class repeat and re-allege every allegation as if fully set forth herein.

187. Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

188. Upon information and belief, Defendants funds their data security measures entirely from their general revenue.

189. As such, a portion of the revenue attributable to Plaintiff's and Class Members' labor performed for David Yurman, and a portion of the fees David Yurman paid to Oracle for hosting and managing employee data, was to be used to provide a reasonable level of data security.

190. Plaintiff and Class Members conferred a monetary benefit on Defendants. They staffed David Yurman's business and in so doing provided Defendants with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendants the wages that were the subject of the transaction and appropriate protection for their Private Information.

191.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

192.    Defendants enriched themselves by saving the costs Defendants reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security.

193.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

194.    Defendants failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

195.    Defendants acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

196.    If Plaintiff and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendants.

197.    Plaintiff and Class Members have no adequate remedy at law.

198.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

    a.   actual identity theft;

    b.   the loss of the opportunity of how their Private Information is used;

    c.   the compromise, publication, and/or theft of their Private Information;

    d.   out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

    e.   lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

    f.   the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

    g.   future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

199.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

200.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of himself and the Class described above seeks the following relief:

    a.   For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and his counsel to represent the Class, and finding that Plaintiff is a proper representative of the Class requested herein;

    b.   For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.  For equitable relief compelling Defendants to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendants' wrongful conduct;

e.  For an order directing Defendants to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.  For an award of punitive damages, as allowable by law;

h.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.  Pre- and post-judgment interest on any amounts awarded; and

j.  Any other relief that this court may deem just and proper.

## X.    **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 18, 2025                    Respectfully submitted,

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery
Texas Bar No. 24052214
lmontgomery@eksm.com
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Phone: (888) 350-3931
Service only: service@eksm.com

**COUNSEL FOR PLAINTIFF AND THE PUTATIVE CLASS**